Case number 22-1278 et al. Antero Resources Corporation and ME Marketing LLC petitioners to the Federal Energy Regulatory Commission. Ms. Taylor for the petitioners Antero Resources Corporation and ME Marketing LLC. Ms. O'Neill for the petitioner DTC Energy LLC. Ms. Banta for the respondents. Mr. Foreman, the interveners. Council, Ms. Taylor, please proceed when you're ready. The entire premise for the new PCG paper pools was that they would provide increased liquidity in the market for responsibly sourced gas and that gas aggregated at the pooling points would likely trade at a premium. Both Tennessee Gas Pipeline and FERC endorsed this rationale. The PCG criteria govern who can and who cannot access the pools and all of these benefits. It's hard to imagine a term that could more significantly affect this FERC jurisdictional service and yet FERC has disclaimed oversight of the gateway criteria for the PCG pools altogether. Council, can I give you a hypothetical which would help me understand your position on standing in this case? Let's say that I'm a railroad regulator and you are a railway operator. You're a company that runs trains. You have a train with two cars. These cars are identical. They run on the exact same timetable, at the same price, and to the same destination. But car one only carries organic food and car two carries any kind of food, organic or otherwise. You, the train company, decide to post the criteria for defining organic on your website. Then a farmer who sells organic food sues me, the regulatory agency, and says that I should require you, the company, to put the definition of organic on a document that's submitted to me, the regulator. The farmer says the fact that the company is defining organic food could affect the price of organic food. Has the farmer shown that he has suffered a concrete injury inflicted by me, the regulator? Have I harmed him by letting the company put the criteria on the website instead of in a document submitted to me? I think that if, in your hypothetical, the regulator, the filing of the document with the regulator was the predicate for review for those criteria as just and reasonable, then there is a procedural injury in your hypothetical. The purpose of the public filing requirement, and it's a statutory requirement, it's something that's very well established in FERC's own regulations and in the presence of this court, is because that then prompts the section four proceeding in which the pipeline has to show that this is just and reasonable, and FERC then exercises its supervisory authority and determines whether it's just and reasonable. But how are you harmed if you're the farmer by the fact that the criteria is put in a website versus... Because once the criteria is on the website, and also in this hypothetical, the regulator has said, not only are we not going to put that in the tariff, but we don't have jurisdiction over it. We're never going to review. Well, in my hypothetical, which I think is on point in some respect, I'm a regulator of transportation. I'm not a regulator of what is organic food. And FERC is a regulator of transportation of gas, not the qualities of the gas. So I think that that's apt. So how are you harmed by me, the regulator, just saying this criteria, which I'm not in charge of, it's on the website and not in the tariff or in the document that's submitted to me? Because as a customer of the railroad or the pipeline, but NTERO has a procedural interest in... FERC's statutory duty is to protect customers of pipelines against the potential monopoly power of the pipelines. And so the fact that... So by agreeing that the service can be for the service to be sort of not just deferred, but completely excluded from jurisdiction. In that hypothetical, the regulator has allowed the railroad to create a market for something that everybody agrees is going to be valuable. And then has stepped back and said, despite the fact that we're the economic regulator of this entity, we're actually not going to take any responsibility for the gatekeeping criteria for who gets to access or not access the positive premium that everyone agrees is going to exist in this market. And I think just to also take a step back from... I don't want to fight the hypothetical. I'm happy to continue to discuss it. I'm trying to understand the procedural harm though. What is the procedural harm? The procedural harm is that as a producer of gas, who ships gas every day on the pipeline, and also produces responsibly sourced gas, FERC has said to NTERO and other similarly situated producers, we're going to allow this pipeline to create a market that affects... That's a concrete interest, right? We're in the Lujan hypothetical. We live next to the dam, right? We have a concrete economic interest that's going to be... But it affects your interest in what respect? Because you can still transport your gas the way you always have. That's the same... I guess all the same terms. And it seems to me that given that you can do that, this is just an informational thing. So how are you harmed by where that information is placed? So I think this is a distinction that FERC attempts to draw in its brief between what it calls actual transportation, which is like, I understand that to mean physically getting gas molecules from point A to point B... Yeah, I'm sorry, but even under the pooling program, the pooling arrangement is exactly the same. But as a scheduling service, it's the same. But there's this what they call an informational feature. There's two separate pools. I mean, there's paper pooling for ordinary gas and paper pooling for responsibly sourced gas. Everybody assumes, and FERC and Tennessee Gas Pipeline, that the responsibly sourced gas is going to trade at a premium. FERC is the economic regulator, right? It's not just... But the trading at a premium is not about the terms and services of transporting the gas. I would submit that trading at a premium is the type of... I mean, FERC doesn't regulate gas prices, correct? It does regulate the prices, but... Of transportation. Of transportation. But not gas prices are going to change. We're saying that FERC is looking at... The prices of transportation will be the same. It's free. The scheduling service will be free. The actual transportation... I don't want to get hung up on those distinctions. But what FERC is saying is, you know, I think FERC should essentially be saying, well, it's okay as long as you can schedule your deliveries, get your gas molecules from point A to point B. That's actual transportation, and that's all that we have responsibility for. But respectfully, that is not their statutory mandate. They're the economic regulator of pipelines. Their job is to ensure that when pipelines offer jurisdictional services, and there is no dispute that paper pooling is a jurisdictional service, that that's offered on a non-discriminatory basis to all of their customers. And that's the purpose of having these provisions. But this is a non-discriminatory basis. You can use it or not. Well, it is discriminatory in the sense that they're saying there's, there's two different pools in which you can trade, and you can only gain access to the one where the premium will be charged if you meet these criteria. And yet we're not taking any position on what those criteria are, not only now, but indefinitely into the future. They're saying we have no jurisdiction. So again, they allow the service to be offered as a second scheduling service, the paper pooling service in the tariff. And yet, so that they recognize that it's a jurisdictional service. And yet they're saying, well, we aren't comfortable saying what organic food is or saying what RSG is. And so we're going to let the pipeline change those criteria at its discretion. I mean, to put the point a little bit differently, if you're the farmer and you're deciding, do I grow organic food this year or do I not grow um, you don't, you're not able to rely on the stability of the definition of what constitutes organic food because it can change at any moment subject to the... But FERC is not defining this criteria for the entire market. They're just saying for purposes of the pipeline. They're allowing the pipeline to change the criterion at its sole discretion. But even if that were in the tariff, couldn't you change it? If it were in the tariff, they would have to change it by filing a change and then FERC would review it. But it's not immutable just because it's in the tariff. But FERC is saying it doesn't have any jurisdiction over this. So in other words... I'm trying to understand like why this is important to you, because if your issue is that this creates uncertainty, it doesn't make it certain if it's in the tariff versus on the website. What is certain? So as a customer of the pipeline, right? The customers are making business decisions with the understanding that FERC is going to do its job as an economic regulator and customers rely on the stability that that affords, that there's not going to be discriminatory terms and provisions and tariffs, that they're not going to be changed at will. Let me ask you then, isn't your theory of standing then relating, relying on the speculation that Tennessee is going to change things willy-nilly whenever they want with little notice, even though they have to give you three days notice? And isn't that speculative? I don't think our standing is relying on that speculation. Our standing is relying on the fact that any business that's rational is going to take into account the stability of the market conditions and the regulatory picture when it makes decisions. And if you have a guarantee that the economic regulator for the pipelines is going to supervise, review any changes in criteria and make sure that they're just and reasonable and that you will have an opportunity in that review process to have your say about the changes to the criteria, then you can make your decisions under those conditions. If in contrast, the pipeline is able to change the criteria with 30 days notice at its will without that review for justness and reasonableness, then that entirely changes your expectations as a market participant. I have just one last question on this. And where can I find this in your opening brief? Pardon? Where can I find this theory in your opening brief? Well, in our opening brief? Yes, because that's when you're supposed to establish standing. We established in the opening brief that we ship gas on the pipeline, that we are a producer of section on standing, the ANR pipeline case, which I think is a very good analogy, because in that case, one of the relevant factors was the pipeline, the pricing had effectively been, the pipeline had been ordered to raise its rates. And the customer was aggrieved by that order. And the actual filing happens, because at that point, it's going to be a fata complete, right? And can you review that every producer of responsibly sourced gas who uses the pipeline has standing? Even if they don't, they don't even need to say, I'm going to use the PCG pooling pool. They just have to be a customer that produces responsibly sourced gas. Yeah, I think I believe that being a customer who produces responsibly score sourced gas, who is, you know, is a sufficiently concrete economic interest under this court's procedural injury cases to give it standing. And they don't, you don't even have to say, I'm planning to use the paper pooling service. Respectfully, no, because the point is that we're not able to even, you know, make those planning decisions against the backdrop of FERC's economic regulation, it's doing its job. There's a sort of a chicken and egg problem here, right? Because they're, you know, unless and until those criteria are overseen by FERC, then... They've been, I guess, in effect for a year, is that correct? They have been, but again, without this backstop of FERC oversight, right? So the point is that now producers are in the position, I mean, the fact that they've been in effect for a year, and... You don't even have to state to establish standing that you want to use the paper pooling services, but only if FERC oversees them. You don't even have to say that. It's assumed. We have a concrete economic interest in shipping gas, and we're a producer of responsibly sourced gas. So our procedural injury is that, you know, when the criteria are, if the criteria are altered, that we wouldn't even have recourse to go to our regulator. So in that case, in that situation, the EPSA case is an analogy, right? EPSA had standing. It didn't have to assert or predict that there was going to be an ex parte communication someday. They had an interest in the proceedings having regularity and integrity that they knew that they were going to be, and their members were going to be participating in. We're a customer of Tennessee that's undisputed, and we have an interest in those procedures having their even taking place, right? Because now FERC has said these criteria, we don't have jurisdiction over them. So it's not a situation where, you know, we know that there's going to be a future rate filing, and at that point there would be an opportunity to challenge the criteria if we have a substantive disagreement with the way that they're framed or if they're changed in a way that we think is arbitrary. Because FERC is saying we have jurisdiction over those. We are never, they're not in the tariff. We are never going to review that kind of challenge. So under your view, any time a regulatory agency decides that it's not going to regulate it in an area, then an entity that wants there to be regulation so that it can talk to the agency about what the regulation would be would have a procedural injury. I wouldn't put it that broadly, your honor. What I would say is that when an agency as here has a statutory duty to ensure that any terms that significantly affect jurisdictional services are included in the tariff so that it can exercise that statutory duty to ensure justness and reasonableness, and it shirks that duty by saying even though this is a gateway criteria, it obviously is going to affect access to this valuable market that we're allowing this pipeline to create, and therefore you're not going to have that future opportunity, then there's a strong claim on the merits that they have a duty to regulate. But in terms of just the injury for standing purposes and traceability for standing purposes, it seems like what you're saying is if we would be able to talk to a regulator about the degree of a regulation that we wish that they would exercise so that we would have some back and forth with them about that subject matter, that's the kind of procedural injury that gives us standing to seek relief that requires them to regulate in that area. I think, again, I wouldn't put it that broadly because the tariff is itself sort of, you know, it's the linchpin of this entire supervisory system. So the reason why the statute says you have, you know, terms that significantly affect jurisdictional services have to go in the tariff is because then they're filed under Section 4, that's where the into, you know, whether they're just and reasonable. Then if they're going to be changed, there has to be another filing and a further proceeding. So we're not just sort of saying, hey, we want you to reach out and regulate this thing that may or may not be within your jurisdiction and we feel a little bit aggrieved that you haven't done it. It's almost as if, like, this is the predicate for the process that we get. And the reason why the statute is structured that way is to ensure that FERC can exercise its economic oversight authority and that it, and therefore that participants in the market can rely on that backstop and understand that there's not going to be discrimination. It's not going to be regulated in an arbitrary manner. That seems to back into the merits argument, though, because FERC gets to decide what substantially affects the rates, terms, and services. I mean, well, one thing is that for standing purposes, I think this court generally assumes that we are correct on the merits. Um, but also I would, uh, but I don't think that, uh, I mean, the procedural injury, we can posit, and this is clear in Lujan, right? But you don't, but the person who lives near the dam doesn't have to show that the environmental impact statement is going to come out the way that they want. They have an interest in the procedural regularity of the environmental impact, because if it goes sideways, then their property is going to be affected. And again, we have a concrete economic interest here because we produce responsibly sourced gas and we do ship gas on the Tennessee pipeline. And so in that sense, the proceed, we have an interest in the procedural regularity in this case is like the resident near the dam in Lujan or the association that knows that it's going to be participating in these proceedings and knows it's going to have concrete interests that are affected and needs to have those proceedings actually take place in the way that the statute is designed for them to do. Can I ask more standing questions? Sure. I do think that they overlap a lot with the merits arguments. Your standing arguments overlap a lot with the merits arguments. If you're, and I think you have some awfully strong merits arguments, frankly, if the new pooling service is a quote unquote service that Tennessee Gas couldn't have created without FERC's approval, first of all, do you think that's right? Yes. Okay. It's a service that Tennessee Gas could not have created without FERC's approval. Correct. And then you're a gas shipper that wants to access that service, right? And FERC has said to Tennessee Gas, you can decide who can and cannot access the service, right? And it seems like you're injured because you are in a position where Tennessee Gas can deny you access to the service. And Tennessee Gas can only do that unless FERC has blessed the creation of the service that makes that possible. Yes, I agree with that. And that's probably all wrong if you're wrong about the merits, if it's not actually the service. Well, again, this court does presume that we're correct on merits for purposes of standing entry. Pardon? It was a friendly question. Yes. Right. And so, and again, that's almost precisely the, there's a Columbia gas transportation case where there was a pipeline that had, was offering paper pooling, but it wasn't in the tariff. And this is a FERC case. What's the name of that case? I can, let me, it's Columbia. I can give you the date. It was 2002, 1992. So in that case, the pipeline was apparently offering paper pooling, but it wasn't in the tariff. And so there was no way to know who was getting access and who wasn't getting access. And so the commission said, no, you have to put this paper pooling into your tariff so that it can be, that we can be sure that it's being offered in a non-discriminatory manner. So I will, I will check out. I just want to follow up on your hypothetical. Okay, sure. So under Judge Walker's hypothetical, the claim is that by allowing Tennessee to set the criteria, it's a way of barring some people from accessing that pool. In order to have a concrete entry to your client, wouldn't you have to give evidence, because we're here on an agency review, that you wanted to enter the pool, but were denied based on the criteria they set. It can't just be a hypothetical. Some people will be denied access. Well, I think in the EPSA case, for example, there was no requirement that the producers show that there was going to be an ex parte communication. And that it was enough that they, that FERC had passed a regulation that was going to allow those ex parte communications. And the association and its interests, because they were going to be participating in proceedings where that rule would be applicable. Again, this is, and Lujan is clear about this, when it's a procedural injury, the, you have to still have a concrete interest, which we do, because we ship gas on the pipeline. And we produce gas. Can I ask you about this? A FERC standing case called Great Lakes Gas Transmission. It's from 1993. There, the court found standing, and it talked about present injurious effect on the company's business decisions and competitive posture within the industry. Can you make an argument that what's going on here has had a present injurious effect on your business decisions and competitive posture within the industry? Our argument is that... I think you have made that argument. Yes, I think that's precisely our argument. Can you spell it out? Right, because we produce responsibly sourced gas. We ship gas on this pipeline and we are looking at a market that everybody understands is going to create additional, it's going to have benefits. They're creating a new way to trade RRG with enhanced liquidity. Everybody expects it to trade at a premium. And we are, as competitors in this market, looking at that, and we are unable to evaluate whether the criteria for access to it are going to be stable, whether they're going to be just and reasonable, whether they're going to be supervised by this regulator at all. So is that a procedural injury? I'm not sure I'm hung up on whether it's a procedural injury. That's not a procedural injury theory, right? The one that was in Great Lakes was not a procedural injury theory. I don't recall the specifics of whether that was categorized as... But I would, I mean, to the extent that we need to... I mean, I think that the procedural injury cases are helpful because they emphasize that we don't have to show that the decision is going to come out one way or another. We don't have to prove that Tennessee is going to arbitrarily or discriminatorily change the criteria, right? Great Lakes involved a regulated party. The petition in Great Lakes was the party being regulated, not a customer of that party or some third party that's affected. Yes, but the whole purpose of the regulatory scheme is to regulate the pipelines who have potential monopoly power in order to protect customers like Intero. So if anything, you know, are... I understand. I just think Great Lakes doesn't help somebody who's not a regulated party. To the extent that it is... Which you're not. Well, you know, we're certainly actively engaged with FERC, you know, in this area, but also, you know, if anything, we, you know, as the customer who the scheme is designed to protect, have an even greater claim to the, you know, recognizing the injury that we would suffer if our business decisions in this market are not framed with the backstop of FERC supervision that would protect our reliance... That's one clarifying question, which is... And there may be a difference among the two petitions. I'm just trying to get this straight in my mind. For your purposes, do you... Is your position predicated on the idea that FERC has to wrap in the criteria into the tariff? Or would you be okay if they didn't wrap that into the tariff, but then they also didn't wrap in the pooling option to begin with? We would be okay with both our primary... The primary relief that we requested was that they be directed to incorporate the criteria into the tariff so that they can be supervised. But if, in the alternative, on the basis of the jurisdictional concerns that FERC has articulated, or for some other reason, the court decided that everything would be out, that would also give us relief. And that highlights the fact that, you know, this paper pooling service is, in fact, creating value because it is offered by the pipeline under its tariff, right? There's an ability to create an enhanced liquidity in that market. And so, as long as that's the case, the criteria need to be in the tariff. Otherwise, if the whole thing is excluded from the tariff, we can go back to the bilateral trade system that currently has been the way that... So it's an all or nothing proposition for you that as long as the orders get vacated, you don't care which way it goes. They just can't draw a distinction. They can't do this half measure. Our first ask is that they include the criteria. If everything goes out, we would also be satisfied with that. You say you're an object of regulation, and then a minute ago you said you're not a regulated party. What's the distinction? What line are you drawing? So, you know, I think the language object of regulation in Lujan is not really founded upon in that opinion. But, you know, the point... I think the distinction that would be drawn is that sometimes you see cases where there's attenuated theory of standing based on a procedural injury. If you go back to, you know, there's a group that's saying, well, if this tax cut is enacted, that's going to de-incentivize the, you know, production of a certain kind of product. And we have members who would like to visit the lands that are new to this. Like that kind of, you know, those parties are not the objects of the regulation who have the tax cut here. You have oversight of a market. Pipelines are the directly regulated entity, but they're regulated for the benefit of the customers who participate in these proceedings on a day-to-day basis. And so that's why, you know, we believe we fall within the object of regulation line. Thank you, counsel. Thank you. Ms. O'Neill. Good morning, your honors. I'm the executive court, Shannon O'Neill for petitioner EQT Energy, LLC. FERC's lack of jurisdiction and inability to ascertain the justness and reasonableness of the producer certified gas criteria left it with only one acceptable course of action below, and that would have been to reject Tennessee Gas's proposal in its entirety. Instead, FERC took the unreasoned half measure of allowing Tennessee Gas to bifurcate the fundamental criteria from the FERC jurisdictional service they govern. This harms EQT Energy because we're not only a shipper on Tennessee Gas, we are the market leader in production of producer certified gas. And what the proposal that Tennessee Gas put in place does is essentially dilute the value of our market-leading gas because it allows gas with potentially four times as much the methane intensity to be included in this same class of producer certified gas and potentially trade at the same premium. Based on your position that you're the market leader, and so you're particularly disadvantaged by this, is your theory of standing the same as the theory you heard articulated earlier? We have a separate theory of standing, your honor. Ours is specific to the harm to EQT. As the market leader, we are focused less on uncertainty in the market that might be set, especially given, again, that those have been removed from FERC's jurisdictional purview. Our concern and the harm to us, which commenced as soon as the service went into place, is that we have the lowest methane intensity gas on the market. Ideally, the relationship between methane intensity and the premium that gas demands should be inverse. We have the lowest methane intensity. We should be able to command the highest premium. We are harmed when Tennessee, as it's done here, for example, it's as if we're the A-plus student and they switch mid-semester to pass-fail. We went from being best in class, having worked very hard, put in the time and effort to get there, to all of a sudden being considered on equal footing with a B-minus student. That is the harm to us and the value of our class. But the harm has to be related to the agency's action or inaction. Correct. What FERC has done is allowed Tennessee to put in place the service that perpetuates that harm, despite FERC's acknowledged inability to ascertain whether the criteria that govern access to that service are just and reasonable. But again, regardless... What would FERC do that would remedy the harm you see from having a pass-fail system instead of the A-plus system? This is what differentiates us from council down the table, Your Honor. The only appropriate course of action for FERC would be to throw out the proposal in its entirety. We are harmed regardless of whether the criteria are incorporated in the FERC jurisdictional tariff or not, because it's the existence of the service that dilutes the value of our gas that harms us. It is not directly whether or not FERC is able to control the criteria that gatekeep access to that service. And so because FERC, as it acknowledges, is unable to evaluate those criteria, the only appropriate course of action is for them to have rejected the proposal in its entirety. So we would be asking here that their orders below be vacated and remanded. And they can't go in either direction for your purposes then. FERC just can't enter into this The other position is worried that it's a half measure and you can either level up or level down. They wouldn't care. For you, that's not the case. That's correct, Your Honor. FERC does not have the jurisdiction to evaluate the criteria. They've also acknowledged they lack the expertise. It's beyond their authority. So there is no universe where this is appropriately included in the FERC jurisdictional tariff. What if there were no criteria? What if they just said you can have a paper pooling thing for RSG? Will the market decide what that means? I think that would be a different circumstance, Your Honor. I don't know under those circumstances though what would differentiate that from Tennessee Gas's existing pooling service. It would be bilateral, what you're saying. Those are bilateral transactions. Maybe I don't understand the paper pooling PCG service. Is it that there's a pooling point so all the buyers and sellers who want RSG go to that point and within that point you can't differentiate the A pluses from the B minuses within the pooling point? So if I can speak to I think what was your first question, what's going on with the pooling service generally? So this is paper pooling. So it's an administrative construct that exists solely to increase liquidity on the system. It's kind of like if you put $50 into the ATM you can get it out somewhere else across town. It's not exactly the same $50 bill you put in but you're still getting that same quantity out. So it's an administrative system that's in place and what Tennessee has set up under this proposal is a gas that's able to satisfy the PCG, the producer certified gas criteria that they've established and that are separately now hosted on their website to change at will. So I think of it like as a meeting point for the buyers and sellers who want this particular kind of gas. Sure, yeah. Although again there is physical pooling so just to differentiate it's a virtual meeting point of sorts. But you're saying that in the bilateral market you're currently in people can differentiate between the A-pluses and the B-minuses but at the paper pooling point they don't have to because they're there, they have to meet some minimum criteria to be there. But within that pool there's no way to differentiate between the A-pluses and the B-minuses? Within the pooling service that's correct, Your Honor. All gas that meets the criteria that Tennessee establishes is producer certified gas. It doesn't matter if it's 0.5% methane intensity or excuse me 0.05% methane intensity or 0.2% methane intensity. It is producer certified gas as compared to in a bilateral transaction where we would be able to market the lowest intensity gas that we have available and for certain consumers who are perhaps under independent state or local regulatory. But aren't you saying that you're harmed by any standard because you harm you? So any kind of standard harms you whether it's by FERC by Tennessee or by anybody? Within our universe of FERC regulatory scheme yes, Your Honor. There are no broader governmental standards as to what constitutes responsibly sourced gas at present. It's possible that might change in the future but that is wholly outside FERC's jurisdiction to wade into which is precisely what they've done here despite claiming that that's not their intent. Does that address your question? Yes, thank you. I was just trying to, can you just walk me through the chain of I guess causation and redressability etc for your standing argument? Sure, Your Honor. So Tennessee Gas comes to FERC. They put forth this proposal initially notably also in their first go-around. FERC threw this out entirely. That was docket RP-22-417. Tennessee Gas came in with the criteria incorporated in the tariff itself. FERC said we don't have the expertise, we don't have the authority, we can't evaluate whether this is just a reasonable rejected on those grounds. Tennessee Gas seeing value in this proposition comes back. They put forth a proposal that they think will comply with what FERC is looking for and that is with the service itself and the FERC jurisdictional tariff and the criteria that they keep access to the service separately hosted on Tennessee's website. Throughout EQT in the initial docket and again here has commented and then protested and requested rehearing on the grounds that regardless of how that service is set up, we are again harmed because we as the market leader are deleteriously affected whenever there is a service put in place that dilutes the value of the highest quality top-of-class gas and that is what the service does because it essentially broadens the field. Tennessee has taken responsibly sourced gas, put their own sort of title on it, producer certified gas and allowed that field to encompass not only the top-of-class gas but also gas with four times the methane intensity and that is a harm to producers such as EQT who have put in the time, the resources necessary to continue to drive down the methane and the relative methane intensity of their gas. So you're saying FERC allowed Tennessee Gas to post this criteria on its website? And because that picture is on the website, some people will buy I guess grade B minus or C gas instead of A plus gas? Yes your honor. Isn't that speculative? Your honor, and I know that FERC filed a 28k that shows the report from the past year that no one's entered into this but it's not speculative because the fact that that exists, there is still that imminent harm that as time goes by that service will become... As soon as you get to as time goes by we need an imminent harm. The imminent harm again commenced as soon or the harm commenced as soon as the service went into place. The fact that no one has utilized the far is not determinative on a lack of harm. But are you saying anybody who buys B plus gas subject to this paper pooling service with the criteria has harmed you? It's not the customers who buy the gas that have harmed us, your honor. It's FERC who allowed that service to go into place. But the service has to harm you in order for FERC to have harmed you by letting go into place. So I'm trying to figure out how the service harms you. So an example, as a customer I perhaps am under an independent regulatory mandate to go out and procure responsibly sourced gas. I could do that through a bilateral agreement with EQT. That's the system that was in place is in place. But alternatively there's this convenient administratively efficient pooling service offered to me via Tennessee. And again, pipeline infrastructure is not fungible. It might be the case that Tennessee's gas system is one of the only ways for me to procure gas. So rather than go to the trouble of entering into a bilateral agreement with EQT, instead I think to myself I'll use this administratively efficient pooling service. I get to satisfy my regulatory mandate. And on top of that the service has the imprimatur of a federal government agency's approval. But why isn't that speculative? You're speculating what a customer will do in response to this being there. And they could go to the paper pooling service and buy from you because you could be in the paper pooling service. They could, Your Honor. But as a participant in the paper pooling service, I'm again not able to get the full premium that I would through a bilateral. You'd be better off if that seems like an identity. You'd be better off if you didn't have to share with everybody else. Because you can advertise yourself as the very best in the field. You should only do business with us because we have the very, very best. If you truly have the courage of your convictions and you really care about being as environmentally conscious as possible, you should come to us. Your theory doesn't have anything to do with the criteria, actually, being on the website. It has to do with the existence of the pooling option, period. That's correct, Your Honor. BERC is under a Natural Gas Act mandate to ensure that the regulations, the qualifications, the standards that pertain to jurisdictional service are things it can review. And so it was a... It advocated that mandate when it allowed Tennessee to remove those criteria and put them on a website. But we're again agnostic as to what the criteria are. BERC has no jurisdiction over this area at all. And the only way we are alleviated from harm is if the service itself, in its entirety, is thrown out. The service being pooling service? The producer certified gas pooling service, Your Honor. Yes, right. Pooling service for the... What's the... You said producer certified gas? Yes, Your Honor. Or RS, whatever the acronym is being used. Yeah, RSG, okay. Yeah, there's a lot of acronyms. So you just conceded that it's efficient and easy and good for the market. It's just bad for your clients and therefore should be thrown out. It's efficient and easy, Your Honor. It's not good for the market because it removes the incentive to continuously drive towards the lowest methane intensity gas with the promise of the reward of the highest premium. So those things are not the same. It could be the case, again, that it's preferable on the customer side just for reasons of ease, but it still depresses the ideal price in the market for the best possible gas. Right. I mean, your whole business model presupposes that people are going to act in a disadvantageous way if it's just based on cost. You presume that people will be willing to pay more in order to get the most environmentally conscious production of gas. It's beyond a presumption, Your Honor, because, again, many customers are already under- Right, you're just operating on that assumption. And so your idea is, so because we're the best at it, we want to be able to make sure that people can act on the fact that we're the very, very best. That's correct, Your Honor. Can I ask a question about how the pool works? In my head, I'm imagining something like a wholesaler. So maybe actually before I start the question, I know how a bilateral trade works, right? And let's just imagine that it's, let's borrow the Supreme Court's pork case from last year. So I know how a bilateral pork trade, there's a pork farmer and he sells to pork, you know, people who kill them. The people who eat, you know what I'm talking about. I'm following. Okay. Now imagine that they're, so it's a bilateral trade. A wholesaler would take a bunch of different pork producers, combine it into some giant warehouse, and then just sell to retailers from there. Okay. Is that how the pooling service works? That there's people who produce the gas in a very clean way, people, in other words, the people who do like the free range pork, and there are the people who produce it in a dirtier way, compare that to the not free range pork. They all sell to this wholesaler where all the pork kind of at that point is the same. And here in the pool, all the gas at that point is the same. And then purchasers buy from the pool. Is that how the pooling service works? Or am I just, or is it more like a bilateral trade that just made a little bit more efficient? I think if I can expand your hypothetical, your honor, I think it's close, but a couple key differentiations. So the whole idea of increased liquidity. So it's hard to draw a parallel to this in the pork markets, but it's as if I produced a pig in Texas, I sold you the pig, but due to the pooling, you're able to procure a pig in Virginia, but basically as quickly as possible. It's not the same pig, but I sold you a unit of pig, but we've made it more efficient so that you can get it as quickly as possible. Even if it's not exact, literally the same pig I sold you. That actually does sound more like a bilateral trade that's made more efficient as opposed to kind of buying from a middleman who has pooled all of the manufacturers products. Well, I think the differentiation again, your honor, is that again, it's tough with pigs, but it's almost as if there was in between buyer and seller, there was a amorphous pool of, a virtual pool of pigs. And what Tennessee Gas has done is it's not just one pool of pigs. It's not your organic free range pigs and your confined animal feedlot operation pigs all squished into one pool. It's two separate pooling points. We have one pool over here where we have our A-plus pigs, one pool over here where just any pig can go in this pool. But I thought the two pools, in other words, are the RSGs and then the non-RSGs. Correct, your honor. Or the producer certified gas, the non-producer certified gas. Producer certified gas. Okay. So for the producer certified gas, your problem is that where there's a pool, and yes, it's a pool of only producer certified gas. Your problem is that it's a pool of producer certified gas, but you can't tell how great that producer certified gas is. Whereas in a bilateral arrangement, you could because I would be telling you directly in a one-on-one communication I'm the best. But in the pool for some, is it just impossible to have the pool so that you could tell what the constituent components are of the pool so that you could say, well, in some transactions, you're going to get mine, which is the very best. But in other transactions in the pool, you're going to get some other mix, which doesn't include mine. So you're not going to get my dose of the very best. Does it not work that way? Generally, no, your honor. I don't think we could rule out some universe in which you could set up an extremely sophisticated pool, but that's not how this system is set up. And we would, again, run into the issue where FERC would be without jurisdiction or authority to evaluate whether that was justified. I'm trying to understand practically how the pool works. Practically how the producer certified gas pool, and somebody just says, the buyer, we want to get the benefit of pooling, but we also want it to be producer certified. So we go to the producer certified gas pool. And then at that point, the mechanism kicks in and you just get the gas, but you don't know exactly the ultimate source of the pooled gas. That's correct, your honor, because the participation in the producer certified gas pool, all you have to do is, again, satisfy these criteria. And so any gas that's in that pool, as long as it's below the threshold that Tennessee gas has established, it's good to go, but there's no specification as to whether it's your A plus again, or your B minus. That information just isn't available in the pool. Not the way the pool's set up, your honor. That was my question, but yes, it's so much better. I enjoyed our conversation. I have a question. So I'm guessing that your client does not participate in pools. We do, your honor. General pooling service has been around for a long time. And again, it's... So you find your bilateral buyers through a general pool? Separate transactions, your honor. There's gas that we have that participates in pools, because again, most pools exist strictly for administrative efficiency. There's no additional criteria that gatekeeps your participation in them. So it makes sense that you would participate in them just for general sales of gas. Separately for customers who, for whom gas with certain environmental attributes responsibly sourced gas is highly desirable, we enter into bilateral agreements to provide that. Right, because there has to be those customers who think, who are so conscious, and they want it to be so self-evident that they're conscious, that they're going to just ignore the pool altogether. Because they would have the same view you do, which is, I want to be able to show that I'm buying only A plus gas. And so I'm going to enter into a bilateral arrangement. If I did it through the pool, even though it's producer certified, it could be B gas. So that's why the market still exists for bilateral with you. Am I thinking about that right? That's correct, your honor. But I think, again, we run into the situation where the criteria that Tennessee has fixed, they're not stagnant. They can change them. And so they could also continuously make changes to the criteria for participation in their pool, and eventually figure out how to make the most possibly appealing option for customers who will turn to that administratively efficient service, rather than continue to pursue bilateral agreements. But all the while, you know, in any circumstance where Tennessee has established what is essentially a false, meaningless standard for what is good, we will still be driving ahead. But there's no guarantee that due against this disruption in the market, that others will do the same. So to bring this back to standing and concrete, imminent, particularized injuries, it seems to me that there are customers out there who want A plus gas. And that's who you're selling to right now and paying a premium for A plus gas. And so you're speculating that if there is this lower standard that is set by Tennessee gas, some of your A plus customers will go there. Isn't that speculative? Because if they're motivated enough now to pay a premium for A plus gas, as the chief judge said, they won't go to the pool, they'll just stay in bilateral transactions with you. And so aren't you speculating? And then you also said, Tennessee can change this at their will, this, that, and the other. Again, speculating, we don't know what they're going to do. And in the past year, none of this has happened. Oh, I'll try to address all of your points that you just raised there, Your Honor. First of all, again, it might still be that customers decide that they want to pursue bilateral agreements. It's unlikely, though, that given the option between a administratively efficient, federally approved service... But these are the people who are willing to pay top dollar for your premium A plus gas. And those customers might do exist, but there are probably also, there are definitely also other customers who will still choose the less good option. And that harms us nonetheless. Maybe they never bought your gas, maybe they never bought the B gas. That also is somewhat speculative, Your Honor. It's not speculative, it's my point. But it's sufficient that the harm be substantial and imminent. And again, given that we are already... And concrete, I guess concrete is the word I'm looking for. I think it comes back again to we are not speculatively involved in the market. It's not a question of whether we will or will not be... Well, you're in it, but the effect on you is speculative. The effect... It depends on what these customers do, and you're assuming they're going to do something that we don't know they're going to do. Well, that's true of any market, Your Honor. But I think it's reasonable to expect customers will behave somewhat rationally and will adopt the efficient and the government approved option, rather than continue to expend the time and effort to enter into bilateral agreements. I see my time is up. So, if there are no further options, I'll request simply that you vacate and remand for disorders below. Thank you, Your Honor. Thank you, counsel. We'll hear from the commission now. Spanta. Good morning. I'm Carol Denson for the commission. I suspect I'll spend much of my time on the merits, but I would like to make just a few brief points on the standing questions. We submit that both opening briefs fell well short of petitioner's burden. They both spilled a lot more ink on reply, which this court routinely finds to be too late. Antero introduced an entirely new argument in its reply brief on the procedural injury, which is why we have not had opportunity to brief that. And in our view, both parties tardy efforts still fail to satisfy their burden under this court standards. With that said, on the procedural injury, as I said, it's newly raised on reply. The cases involve something like an environmental impact statement, hearing ex parte communications agency procedures. And I think the court is right at getting it that the argument here is about the merits. So this procedural injury theory of standing that is really about the commission's merits determination would seem to swallow the standing argument entirely because I can't think of any case where that wouldn't be where that same argument wouldn't come into play, that somehow the commission's merits decision, if you assume that the petitioners are right on the merits, then there's a procedural injury and we don't have to talk about standing anymore. As far as EQT, I think that the court is right that it's just speculation upon speculation upon speculation. Much of it added in the reply brief because it just glanced upon in the opening brief. How speculative is it though? I mean, because uncertainty is not the same thing as speculation. I mean, we say that injury is sufficiently traceable and addressable all the time when we don't know for sure what's going to happen. And I think that their position is, we're better off in a world in which there are two options rather than three. The two options being you have the non-certified gas that's always been there and you can pull that too, we don't care that's out there. We're only looking at the market of potential consumers who really care about it being resourced in the way that is environmentally conscious and the most environmentally conscious. And as for that, we're just better off in a world in which the only still is that world because no one has used at least as of the July 31st report. And I'm not aware of, I'm not aware beyond that, but I haven't heard otherwise that we're still talking about a world of bilateral transactions. I do want to, this may introduce confusion and I may not be in a position to completely explain it. Bilateral transactions can be scheduled through paper pulling as well. Getting into the mechanics of that, I'm afraid I get beyond my own skis pretty quickly, but the bilateral transactions, which are the only RSG sales happening still can actually be happening during the scheduling through the paper pools that exist, the non-PCG paper pool, because nobody's using the PCG one. I don't understand. I guess that maybe I missed something that's obvious, but I thought the whole point of pooling is that you're not in a bilateral transaction. I think it can be both. I think you can aggregate it there and aggregate different supplies. There's more flexibility there, but my understanding is that you can also schedule bilateral transactions through that same paper pooling service. Okay. But then what they care about is, then that's sort of like saying, well, there's bilateral and then you could use this mechanism called pooling to just do the bilateral too. That may be true, but then the point is that you can also do the pooling mechanism to do something other than bilateral and the existence of that. But the effect on prices is wholly speculative, not just because nobody's using it, but even the commission didn't take it as a given. The commission said that the pipeline says it wants to offer this to its customers because there clearly is a bilateral market so far. And we think some parties might be interested in the pooling. The parties interested in the pooling, well, the customers are interested in it for their own reasons. And that does go to causation of addressability because it really is third party decisions driving this. The customers have their reasons for being willing to spend more for this gas and the producers have their reasons for wanting to spend more to produce it because they think they can make the premium prices. None of that is given. None of that is in an affidavit or anything in this record. The commission, when parties raised the issue of price premiums, the commission said it's premature because we don't even know. I mean, we're willing to let, we're willing to allow Tennessee to offer this option to its customers, but we're not even making a finding that the premiums necessarily follow. So even the premium pricing itself is speculative. All we know about premium prices is what producers have been able to get through the bilateral transactions, but we don't know what this PCG pool might, what customers it might draw, what producers it might draw, what prices it might produce, what effects that might have on other producers doing bilateral transactions. It's all entirely speculative because it just hasn't happened. And the commission, I'm looking in particular at JA92, the tariff order paragraph 20 in responding to an argument from the amicus in this case, any concerns about potential price premiums at this point are premature. And then it goes on to say it would not affect the shipper's ability to obtain jurisdictional pooling services. And that brings me to the first point that I'd like to make on the merits. Can I just, before we go to the merits, just so I understand this. So let's suppose you have a world in which there's only one way to do, I'm going to get the acronym wrong, RSGPSG, what's there? They seem to be similar. We try to avoid the acronyms anyway, so I'm happy to just say certified gas. Certified gas, okay. So there's only one way to produce certified gas. So you don't even have a difference between A plus and B and B minus and C. There's only B. Okay. That's the only thing that exists. And we know that there's a bilateral market in which there's people who are buying the B gas because they want to have the certification. And then the idea is, okay, well, then we're also going to create a pooling market because there's going to be certain efficiencies realized by that, because maybe you're having a bilateral transaction in a one-on-one way, but it could be much more efficiently done on an aggregate basis if you allow pooling. It's all the exact same thing, but you're just allowing access to a greater number of producers of the certified gas. If that's true, then if that's the state of the world, then what's speculative about the fact that there's a premium out there for the pool? Because we know that there's a market for the bilateral market. We know that there's people who will pay a premium in order to get at least something that people desire, because we already have a non-certified gas market in which pooling is something that people use. So if we add that pooling component to the certified gas, and we just assume that everybody's producing the exact same certified gas, what's speculative about just knowing that while people apparently want to have certified gas, people apparently want to have pooling. So pooling into the certified gas market is something that seems like a good idea, and it's something that the producers of the certified gas will benefit from because they'll have a greater ability to reach consumers in an efficient way. Right, but what effect it might have on diluting EQT prices is still entirely speculative, because all of that makes sense that there should be a market for this and someone should be willing to pay for it, but we don't know that. We don't know what they might be willing to pay. We don't know that the customers wouldn't still differentiate between this B pool and the A plus gas that they believe they can get on a bilateral basis from someone. So we don't have any numbers attached to the idea that there might be premium prices. There was an expectation by various players in the industry that there would be. The commission said, we don't know. We think that's speculative, and since this isn't even in our jurisdiction, it's not for us to say. What happened here is that Tennessee thought that there was an opportunity for it to serve some of its customers with a more flexible, or actually not more flexible, because to be clear, everyone has access to the same free scheduling service and the same paper pooling points. So the flexibility is the same in that regard. This was an opportunity where pipelines often come to the commission wanting to add or tweak their pooling and paper they want to attract those customers. There are numerous pipelines that run into these different concentrate production areas, and they all want to get producers to use our pipeline, ship your gas on our pipeline. So they all want to offer flexible pooling points and pooling options. And when pipelines come in to the commission and want to add something to their tariff that they believe will better serve their customers and better attract those customers to them, the commission generally approves those kinds of flexible additions to their service, with the number one concern being, does it take anything away from existing customers, especially existing firm service customers? That was a non-issue here because the commission concluded this changes nothing for any existing customers. It's the exact same service, and in fact, the commission viewed this and characterized it as an option within the existing pooling service. And specifically, I think it's rehearing order 18, I can check, somewhere around 16 or 18 in the rehearing order, actually rejected an argument by someone that it is a separate service. It is the exact same service with effectively an organic label attached to it. It's just a different, you might be selling, I could get lost in the metaphor there. The pooling service that was already available? Yes. It's free. It's the same pooling points. It's voluntary. So it is the exact same service. There are heightened criteria for entry, right? It's the same service. It's the heightened criteria to get a label that you can stick on it, but it's the exact same service. With the heightened criteria for entry? With a different criteria, but the commission said not for entering. The commission didn't view it as a separate service. It viewed it as a label, an informational feature is what it called. It's a marketing label that you can get this label that you could attach to it, which you could also get on your own. What if it had been the first pooling service? So imagine a world where there's only bilateral trades. And then Tennessee Gas says, well, I think it'd be great to have a pooling service. And so they get FERC's, you know, they file tariff, they get FERC's approval for creating this service. I think you would recognize that's a service. And they say, the criteria for entry for this service will be put on our website. We can change it whenever we want, as long as we get 30 days notice. Would that be okay? Well, it depends. Are you talking about the PCG criteria? So it wouldn't be for anybody but PCG? Yeah. I think then, because no one else is able to get this pooling service, I think that the commission would find that, likely find that unduly discriminatory. But the fact that everybody can access the same- They find it unduly discriminatory. Because it would have the non-PCG producers wouldn't have access to pooling. In the same way that they don't have access to this PCG pooling service. But they have access to the pooling service. They have access to different poolings, a separate pooling service. It's not separate. They have access to the same pooling service, but not the label. I don't want to get hung up on but- Well, we're using labels. But it is an information feature. The commission did not see it as a different service because it is the same scheduling service from all the different points. As it is in the regular- You can trade at the same point and get the same service, but you don't get the label. You don't get the informational label that this has a certification from Project Canary or the other- Do you know why the dirtiest producer of gas can trade in the PSG pooling service? No, they can trade at the exact same pooling points at the exact same rates and get- It just sounds like two different pools. Well, the commission didn't view it that way. It viewed it as a label. That's why we're here. Well, yes, but the commission does get some discretion on this kind of issue. When it looked at whether it significantly affected- Discretion depends on pointing out material differences between this and our precedent that says when you do this, it's a pool. Labeling it an informational feature is not a substantive material difference. It's a label. It is a label because all of the scheduling service and all of the pooling points are the same. Can I ask this question? Maybe it's a way to tease out whether it's just labeling. Maybe it's totally off. Just tell me if you think it is. Suppose that for some reason there's a market out there for buying gas from producers whose corporate name starts with the letters beginning A to M and just don't want to buy gas from anybody whose letters are from N to Z. If the commission allows- There's pooling. There's pooling out there already before it turns out that there's this emergent market of people who only like initial letters in the alphabet as opposed to latter letters in the alphabet. Then the commission says, okay, apparently there's this thing out there. We'll allow there to be a pool that's limited to producers whose names start with A to M, and we'll allow that pooling product to exist. We're not going to monitor when somebody decides whether their corporate name begins with A, B, C, or M, or Z. That's up to them. They can figure out. Apparently, buyers care about that. We'll just let that happen. We're not going to police the criteria at all. We're just going to allow this separate market, this separate pooling product to exist. Is that similar to the way the commission is thinking about what this is, or is that hypothetical just totally off? As long as we're saying that N through Z still have access to all the same pooling points and all the same transportation, same rates, charges, terms, everything- Again, because it's only- Whether your name starts with A, B, or Q, Z. I think that the commission, I mean, unless you can find something discriminatory in it, if some were being denied service, if suddenly the companies that start with P don't get to use the pooling point number 19, or were somehow- They still have access to all the same pools. They're just not going to have access to those consumers who care about the fact that their name starts with P. They wouldn't do a bilateral arrangement anyways, because their name starts with a P. They want the benefit of the pooling, but they want to be able to differentiate based on a criteria that the commission, by hypothesis, just doesn't care about. Right. I think that the commission would say it doesn't significantly affect the service under the Natural Gas Act. The commission would just do that, even though there is now a different pool, because there's a pooling product for only A to M. Well, there's a label that those customers would see, but as long as all the terms of service are the same and no one is being boxed out or charged something different- And to be clear, the buyers who care about A to M are willing to pay a premium for that, because for whatever reason, they really care about it. Right. Is that the way the commission's viewing this? That we don't care about the preference. But apparently, some people have the preference. Yeah. Paying is a good thing. So we're just allowing a pooling mechanism that allows consumers to give effect to their preference. I think that's right. Not that the commission doesn't care, but the commission does say we don't have jurisdiction to- Right. Right. So I guess it's kind of like saying we don't care. We can't care. Yes. We can't care. I think that's- Yeah. As long as, again, the main thing the commission is looking at, does this significantly affect the service? And if they're still getting the same service and it's not harming anyone who already had the existing service, if it's just a label added onto the existing service, then I think the outcome would be the same. I mean, there's still a pooling product out there to which it's a new pooling product that didn't exist. It's just a new label, but all the service that you get is- When you say service, you mean transportation service? What do you mean by service? Well, with pooling in particular, it's scheduling. And I don't fully understand how that works, but it is the sort of administrative, like scheduling how... It's, I think for accounting, it's sort of the gas is from this point, even though it really was from a different receipt point. And then, of course, there is also the transportation service in the pipeline, which isn't even an issue in this case. For our purposes, when we're looking at what needs to be included in a tariff, we're looking at things that significantly affect rates, charges, and service. And when we're talking about service, we're talking about the service that FERC has jurisdiction over, which is the transportation. Yeah. And here, it isn't physically moving the molecules in the pipeline, because that is part of their transportation service. It's not an issue here. It is the paper pooling points, which are just an administrative kind of a fiction of collecting all the gas and saying it's at this point, virtually. So, yeah, it's scheduling. Because something like, what is the quality of the molecules in the pipeline, is something that the sex service broadly defined. That's not what service means to FERC. Well, it is actually... Well, gas quality standards... That was part of the tariff. I thought that that was part of a tariff. I could be wrong. Gas quality standards are a very different thing. They're not about producer certification. FERC regulates that all the time. Yes, it has to. Because... I think that's the difference between producer certified and not. Sure. All the gas that goes in the pipeline has to meet whatever that pipeline's gas quality standards are, which is why it does have to put those standards in the tariff, because it can deny you access to putting your gas in the pipeline. Now, what percentage of this natural gas flow is a liquefiable hydrocarbon like butane or propane? Because if it gets cold and those condense out, they can obstruct the pipeline or corrode the metal. So, gas quality standards are the physical properties of the gas that is being transported. Producer certified gas is entirely about what happened at production in terms of... Well, specifically here, it's about the methane intensity. It's about the methane emissions from the production of the gas. That happens at the well or the facilities near the well. But that gas, when it's delivered to Tennessee, has to meet the same standards for butane, propane, whatever. But not the gas. It's how it was produced. Yes. So, it's a label about how it was produced, but there can't be any dispute in this case. But the gas going into the pipeline is physically the same, with the same low levels of liquefiable hydrocarbons that could actually hurt the pipes. So, FERC doesn't have jurisdiction over production of gas. That's right. And so, when you talk about services under the statute, it cannot relate to production? That's right. That's right. So, when we're talking about services, in the sense that we need to look at it under the statute, it's about production. Because once they're transferring gas to the customer, it's like all the other gas, and it has to meet the same standards for the liquefiable hydrocarbons that might be in it. And whatever happened at the wellhead with regard to methane emissions is important to some customers, and there are certifications for that. But the gas that's physically being transported is exactly the same. And that's why the gas quality standards are an entirely different thing. They are FERC jurisdictional because they are about the pipes and the gas stream moving through the pipes. And this is about how was your gas produced before it got to that point. Why does FERC exercise jurisdiction over the pooling, the availability of pooling to begin with? Because it does have... One of the petitioners say, we don't care if FERC decides just not to get into that mix. And then, so it's out of the ballgame altogether, both as to that and as to the criteria. But the problem is that FERC's drawing a distinction between creating, making available the pooling option and regulating the criteria. So they have to... Well, I mean, I think they still want access to the pooling points for getting their gas. Well, not for certified gas, because they only produce... Well, but they still have to get it to their customers, and it has to get to the pipeline somewhere. And that involves the pooling points. It may or may... I guess maybe they don't want to aggregate it with someone else's and look for their customers there. But pooling points, both physical and virtual, have a lot to do with... I get kind of hazy here, but the gas has to get from the well to the interstate pipeline somewhere, and it interconnects at certain points. But my understanding, at least, especially with paper pooling points, is that we kind of create a... I hope I'm not getting this wrong, but we create a fiction that says, this gas came from here for purposes of prices and the transportation rates in particular, but I don't even know for what else. But we're going to say it started here, because you've got a whole spider web, or maybe more of a radius kind of thing of pipelines, and we have to say the gas started from some point. So we have these pooling points that collect the gas from different parts of the production area. That's my understanding. So even though it's virtual, we treat it as if it's actual physical transportation, and that's why... Well, we treat it as... Since it is in relation to the transportation service, we do treat it as transportation under the Natural Gas Act. And that's why the agency asserts dominion over that part of it, but then doesn't assert dominion over the criteria. That's right. And even with paper pooling, I think, and I believe Conveners Council has some cases on this, that we don't even necessarily... In some cases, we haven't necessarily required the exact pooling points to be in the tariff. We've allowed that to be on the website too. Where the commission really requires things to go in the tariff is when it's going to deny you access potentially. If it's something that is going to deny someone access, it might be the terms in which interruptible service can be interrupted. It might be moving an entire pooling zone or changing a pooling zone boundary. Those kinds of things, those are the cases where the commission has said, this has to be in the tariff, because the producers and the customers need to know that the gas can get into the pipeline, or what are the terms... They need to know in advance what are the terms under which we're going to be denied. So those cases have been about getting access to the pipeline, and that's what's different here. There's no denial of access to the transportation services. There is an informational label that you may or may not get. From the pipeline's criteria, you can, of course, get your own certification. Wasn't that true in Columbia Gas and other cases where a pooling service was being created, and one argument that failed was, well, nothing is really changing here, because you could always make bilateral trades. Everybody has the same access to the pipes, whether they want to do bilateral trades or whether they want to be in the pooling service, and we said no. No, because scheduling is a service too, and that's where I was saying if the... If scheduling is a service, why isn't access to the scheduling service? Because everyone still has access to scheduling. It's like I was saying in response to the A through M, N through Z. As long as the producer that begins with R or the shipper that begins with R can still access the service and have the exact same terms. If Tennessee Gas had an A through N pooling service, and they said to everyone this is an A through N pooling service, and then it turns out they actually allow QRS, would the A through N producers have an injury? Would they have a good argument that that... I think that would only... We don't even allow that as long as N through Z also had access to the same... That would be fine. ...scheduling service. I mean, they can't... That would be fine with... If we had said that it wasn't something that has to be in the tariff because it doesn't significantly affect the service, then I'm not saying that... I was begging the question, but imagine that SBGAS creates the chief judge's hypothetical on A through N pooling service, and it says, but we're going to put the criteria for entry on our website, and it starts out saying A through N, and then later it changes it, and it says this is still an A through N pooling service. This is for customers who want to buy A through N, but it turns out that they're allowing QRS out there as well. It seems to me that the A through N producers who had a good thing going and now have to compete with the QRS, number one, would have standing, but then... Do you agree with that? Oh, they'd have standing in some kind of case, but I don't think it would be a Natural Gas Act case. Okay. I put a pin in that. And then do you agree that that would be kind of something that FERC would not allow? Again, if those criteria weren't something that significantly affected service under the Natural Gas Act to begin with, I don't think they'd have a FERC case. I'm not saying they wouldn't have some kind of recourse against the pipeline toward or something, but it wouldn't be a FERC case. Okay. Put aside standing, because the reason I think it's hypothetical is illuminating, at least for me, is because it goes to the merits, the agency's flexibility on the merits. So let's put aside standing, and then under Judge Walker's hypo, I thought that your answer on whether the fact that Tennessee allows QRS into this nominally A to N pool is something that FERC would care about. Isn't the answer no? FERC doesn't care about that. Otherwise, I don't know how you can defend what's happened with the criteria in this case. Because here, if it turns out that Tennessee has some criteria, and then those criteria are just being mismanaged, and the label turns out to be false, by dint of FERC's not exercising jurisdiction over the criteria... Because they didn't significantly affect the service, it still wouldn't significantly affect the service. Right. So I think you have to be comfortable with the notion that, at that point, nobody can come to the agency and say, hey... I'm sorry if I didn't... I meant to... That is what I meant to say. I mean... I just want to make sure that that... If I'm understanding the hypothetical correctly, that that FERC's position is that, no, this is just something that's out there for you all to work out. It doesn't significantly affect... Right. That's exactly right. Okay. So if we were to disagree with you and remand this case, then there would just be no pooling service for PCG, right? Because one of the petitioners said, we should order you to assume jurisdiction over this, which I think the more correct thing would be just to remand and say, what you've done is not consistent with the act or whatever. And then you probably just would not allow the pooling service, because you're not going to... Based on the orders here, I believe that would be the outcome. If this court said that, notwithstanding the commission's discretion, that this case is somehow more like Keith Van Ravenswood than it is like the Public Service Commission of New York or City of Cleveland. If it's Keith Van Ravenswood and the commission has to say this significantly affects service, then the only... I think it likely would say no. The only reason I even hesitate is because in the earlier order, the rejection order, I think it was April of 2022, the commission in that case when Tennessee had included the criteria in the filing, the commission said, we don't even know how we would judge this. You, the pipeline, haven't given us any basis to judge this. And it did say in a footnote that if there were industry-imposed standards or standards imposed by someone else, whether it's some other federal agency or the industry had come together and said, this is our standard. And Tennessee just wanted to put that, comply with those standards. I think the commission indicated in that case, we might say, this is okay because it fits those industry standards. I'm looking at JA346, it's footnote 13 in that order. So that's the only reason I even hesitate because certainly the commission is not based on these orders. The commission is not looking to suddenly say, we can regulate this and make our own decisions about it. But whether they could somehow get it in based on this, I don't know, based on that footnote. Just two, I think, quick questions and maybe yes or no. Did Tennessee Gas list its quality standards only on its website and change them whenever it wanted to? The gas quality standards? No, there are numerous cases. I think they all are called spurs. They're cited in our brief and in the orders that because that is something that can deny you, they can turn away your gas and say, you're not coming in. That has to be in the tariff because that goes directly to service. Okay. And then second, let's say we disagree with you about whether this new cooling thing is a service. I know you don't want us to disagree with you, but let's say we decide it's a new quote unquote service. At that point, do you still contest that the criteria governing access to the service significantly affect that service? Yes, because even if it is a service, the commission, because the rates and the scheduling service and the pooling points are all exactly the same and the label doesn't affect any of those jurisdictional aspects, I think that the commission would still say that the criteria could be on the website instead of in the tariff. And now if the option had different pooling points instead of the 20 that we already have for everyone, which you can also use for that, if it added 21 and 22, but these are just getting the exact same service. Or if we, I think, well, yeah, I'll leave it at that. Okay. Thank you, counsel. We'll hear from the intervener's counsel now. Mr. Corman. Thank you, your honor. Thank you, your honor. May it please the court, Paul Corman for the intervener's counsel. I'm Paul Corman. I'm the project canary in Tennessee gas. But based on the questions, I think I'm here mostly for Tennessee gas. This is not a new service. Okay. The best way to see that it's not a new service is to refer to GA 18 and 19. Those are the redlined tariff sheets that Tennessee submitted. Those are the pages that specifically identify the pooling points. You will notice that there are no red lines in the identification of the points. There were no points added, no points subtracted, and no points are changed. The only red lines you'll see on those pages versus a very short reference that says, these are the same points as for BCG services, they offer the regular service. So there's really, there's no difference in the pooling at all. But also this is not completely divorced from the tariff. The tariff references the EDV posting in two places in tariff section itself, in section 2.3 B on GA 15. And then in the form of service agreement, which is also included in the tariff on GA 22, they both reference where they both referenced the EDB as the place to find the criteria. It's very similar to what this court found acceptable in that Hacketty case, I hope I got that right, Judge Walker, in where the court was satisfied because the commission exercises discretion that something didn't need to be in the tariff, but you could find it in the tariff where to go to look, where to go look for it. So I think it's very similar, to Hacketty. And the points are, let me talk about how the pooling actually works, because there were a lot of questions about that. And I'm not a scheduler, but gas can come to these pools from various places as scheduling convenience. All Tennessee is just the transporter and all the commission regulates is the transportation. But because you have this aggregation of gas at a similar point, people can buy and sell their gas. They can buy and sell their gas and they do bilaterally. So today, tomorrow, however long they want to, EQT can say, I have the cleanest gas out there, you should pay me a premium. Okay. They can do that today. They can continue to do that. Then the gas, leave the TCG aside for one moment. The gas is aggregated. The shipper who has title to the gas is going to move the gas, nominates it on Tennessee's system, and the gas is then transported to wherever the end user is. All that happens with this service is there's a piece of paper, an informational feature, a bolt-on that says the gas that producer X delivered into this pool is responsibly sourced gas is PCG. So a buyer who cares about that can say, okay, I'm going to buy it. I'm going to buy it from that person. And I'm going to have that person transport, I'm going to have that gas transported on Tennessee. But, you know, as the 20HA report indicated, currently nobody's using the service and I can represent to the court that that remains true as of Monday. And I think to switch off the standing for one moment, all of the harm, well, the word harm appears in the briefs multiple places, but they don't say where the harm is. Where is the concrete injury? Where is the certainty that something is going to happen? Everything is, well, if other hasn't happened, if local distribution companies like Tennessee's standards as opposed to something else, well, my guess might be worth less. If the state commissions give some credence to the Tennessee standard, then my guess might be less somewhere else. It's all a series of conjecture of the type that this court has found inappropriate in standing cases in the Kansas Corporation Commission, Florida Audubon Society Commission, all of which are cited in our brief. So I do think that the standing goes to all the various ifs. And at the time you thought this was a new service, correct? We've always referred to it, we really always refer to it, I think, as an information feature. I think they might have said about labels. Again, I'm trying to not dwell on the labeling. I thought that you filed a proposed tariff with FERC that said here's a new service and here's what the criteria for certification will be. It's an add-on service. I mean, I hate to say this, but some of this is advertising, Your Honor. And it's, you know, it's substantively, it's really the same service with the piece of information, with information. Then why did you go to FERC and say, I need you to approve this proposed tariff that has the criteria for certification in it? Actually, Your Honor, at the beginning, the first filing, the company proposed that the tariff, the criteria be on the EBD. Subsequently, a number of the customers- The EBD? Electronic Bulletin Board. I'm sorry, where it is now? Website. The website. Okay. Sorry, sorry, old name. Subsequently, a number of the customers complained and said, we think it ought to be in the tariff. So the company was customer-friendly. We filed to put it in the tariff, okay? We brought it to the committee, you know, we went to the commission and the commission said, no, we don't, we, the commission does not think it belongs in the tariff because it's a characteristic of production, which we don't regulate. It's just an information feature. So take it out of the tariff and there we are, okay? I wanted to get to your question about gas quality a few minutes ago. I totally agree with counsel for the commission. It's an access issue. In a number of those cases, which are all indicated shippers versus somebody, the commission was very clear that one of the major problems was the pipelines in those cases were trying to use postings on their website to override the tariff. That's not the case here, okay? We have a tariff provision, tariff points to where to find this on the website. And we think it's as well within the kind of discretion the commission has to determine what should be on the website, what should be in the tariff and what should be on the website. This is certainly of less significance than the items this court upheld in city of Cleveland, public service commission of New York, which are cited in everybody's brief. Those were cases in which the criteria that was not on the, in the tariff could control access to the service. That's not the case here. Thank you, counsel. Can I ask a question? Why do you think nobody's using the service? Why do I, why do I? Yeah. Why is nobody using the service? I'm not a gas trader either, but I think they're doing bilateral transactions for all we know. I don't know. I don't really know. Thank you, counsel. We'll give each of the petitioners counsel two minutes for rebuttal. Taylor first. Thank you, your honor. First, I'd like to speak to this idea that this is doesn't affect the actual transportation and that it's therefore somehow something that FERC is entitled to be agnostic about. If you read the code gateway for a decision, it talks about FERC's policy, right? They actually had, it was order 636. I believe, although I could be wrong about the number that they don't want pipelines to to create obstacles to pooling. This is something that the commission cares about because pooling facilitates the market for gas. So the idea that it has to block physical molecules from entering the pipeline itself before is something that FERC as the economic regulator should be concerned with. I think it's just not sustained by FERC's own past writings in this area. Then to speak for a moment to the hypothetical about the companies with A through M, I think that an important distinction here is that everyone at the outset thought companies that start with A through M, their gas is going to be valued more highly. Everybody thinks there's going to be a premium for this gas. In fact, in order to obtain a company name with A or through M as the first letter, you have to invest millions of dollars in getting a certification that you qualify for that. I don't think under those conditions, FERC, again, as the economic regulator of the pipelines is entitled to just take a step back and say, well, we don't really care if people are later going to be able to say, well, my name starts with Q, but I'm going to put myself in the A through M pool and then there's not going to be any FERC oversight there. The other point that I'd like to make is that even if this is just an informational feature, we use some other label to describe it, or this court agrees that it's an add-on to the existing service, it still significantly affects that service for the same reasons. There's an economic premium that is associated with this gas. There's also an economic premium associated with the liquidity. Everybody says it's going to make it easier to do these trades. And so at that point, whether you call it an informational feature or a new service, it significantly affects customer access to these pools and the premium that they may or may not be able to access there. Thank you, counsel. Ms. O'Neill, we'll give you your two minutes. Your honors, I'd like to speak to the idea that these are the same service. They're not. They are two separate services. And I think there's a couple of distinctions that are important to keep in mind when we're thinking about that. First of all, again, these criteria exist that govern access to the producer-certified gas service. Those criteria are not applicable to the general pooling service, which is available to any shipper that requests it. And I think perhaps more tellingly, I know that counsel for Tennessee Gas pointed to the red lines in their tariff. JA-15, that's the beginning of those red lines that shows the parts of the PCT pooling service options that remain in the tariff, although the criteria have been bifurcated. And provision 2.3 subpart C introduces independent audit and enforcement criteria that are specific to the producer-certified gas pooling service. Those do not apply to the general pooling service. And that is just another aspect of what differentiates. Again, it sets this apart. The producer-certified gas pooling service is a separate idea from the general pooling service that is governed by these criteria that FERC does not have the jurisdiction or the expertise to evaluate. The second thing I want to touch on is your question, your honor, about why no one has utilized the service. The service has been litigated now for over a year. It's reasonable in that time that parties might want to wait and see what's going to happen. Tennessee Gas obviously still thinks someone's going to use the service and that it has value. If they didn't, they wouldn't have proposed it from the outset, they wouldn't have come back in in the second docket, and they wouldn't still be litigating it here. There are parties in the market that see this service as having value, and as long as that is true, that it stands to potentially harm the premiums available to participants in that market. Thank you, your honors. I know it's been a long argument, but part of FERC's purpose is to encourage efficiency fairness. A regular pooling service, everyone in the room agrees, serves purpose. If you're right, then there will not be a pooling service for cleanly produced gas. What that means is, of course, yes, there will still be bilateral trades, but there will be fewer trades if it has to all be bilateral than it would be if there's a pooling service for this. That's the whole point of a pooling service, to increase the number of trades, make trading more efficient, I think. Assuming that every trade has a gain for both sides, how would it be consistent with FERC's purpose and mandate if at the end of the day, what we're left with is a regime where there can never be a certified pooling service. That means a lot fewer trades, which means a lot fewer gains from trade. Your honor, although in an aspirational higher realm of thinking, we would want to encourage those trades, again, to increase movement of producer certified gas and drive the market towards the lowest methane intensity product. The fact remains that those areas are not within FERC's jurisdiction. Although it's within their mandate to protect customers on these pipelines and oversee transportation service, it's not within their statutory mandate to encourage any specific economic outcome or wade into the commodity markets, which I think is getting at what you're describing. Thanks. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Walker, Pan